FIRST NATIONAL BANK IN ALBU-
QUERQUE, as guardian for and on be-
half of Dorothy Jean Huckleby, et al.,
Plaintiffs-Appellants,

v.

UNITED STATES of America,
Defendant-Appellee.

No. 75–1301.

United States Court of Appeals,
Tenth Circuit.

March 24, 1977.

William G. Gilstrap, Albuquerque, N. M.
(Smith, Ransom & Gilstrap, Albuquerque,
N. M., on brief), for plaintiffs-appellants.

William R. Hughes, Jr., Asst. U. S. Atty.,
Albuquerque, N. M. (Victor R. Ortega, U. S.
Atty., Albuquerque, N. M., on brief), for
defendant-appellee.

Before HOLLOWAY, BARRETT and DOYLE, Circuit Judges.

HOLLOWAY, Circuit Judge.

This tragic case arose from the mercury poisoning of four children of a New Mexico family. The source of the poison was meat from a hog which had been fed seed treated with a mercury fungicide. The plaintiffs appeal from a judgment dismissing their suit brought under the Federal Tort Claims Act, 28 U.S.C.A. §§ 1346(b), 2671 *et seq.*, for alleged negligence on the part of Government employees in the registration for interstate sale and approval of the labeling of the fungicide pursuant to the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA), 7 U.S.C.A. § 135 *et seq.*

The basic facts are not in dispute. Mr. Ernest Huckleby raised hogs as a sideline to his regular work as a janitor in the public schools of Alamogordo, New Mexico. In 1969, he and other local hog-raisers bought grain from the Golden West Seed Company in Clovis to be used as feed for their hogs. They were also given a large amount of "waste" grain which had been partially bagged and stored in a shed on the premises of Golden West. The waste grain included some seeds, pink in color, which had been treated with a mercury fungicide, Panogen 15, to protect the seed before it was planted.

The fungicide was manufactured by Morton Chemical Company, whose name was changed to Nor-Am Agricultural Products, Inc., before this litigation began. Panogen 15 was registered with, and its labeling was approved by, the Pesticides Regulation Division (PRD) of the Department of Agriculture pursuant to the provisions of FIFRA.

Some of the treated grain was mixed with garbage and fed daily to the family's hogs. One of the hogs was slaughtered in the fall of 1969 and the family began eating the meat daily. In early December the first of the Huckleby children became ill; by early January, two more children were similarly stricken, and a fourth was ultimately afflicted.[1] By this time, state and federal health authorities had been called in to determine whether an epidemic might be starting.

In mid-January, after an investigation by these authorities, it was determined that the Huckleby children were suffering from organic mercury[2] poisoning as a result of their eating the meat from the hog which had been fed the grain treated with Panogen 15.[3] Thus a "food-chain" poisoning was involved.

Alkyl mercury poisoning does irreversible damage to the central nervous system. It affects sight, speech, locomotion and the ability to grasp objects or otherwise use one's hands properly. The Huckleby children suffered severe permanent injuries as a result of the poisoning,[4] as the district court found.

---

1. In March, 1970, Mrs. Lois Huckleby delivered a baby boy who had contracted organic mercury poisoning during gestation. The alkyl mercury contained in the pork eaten by Mrs. Huckleby during pregnancy had crossed the placenta and entered the system of the fetus.

2. The specific poisonous substance involved was a compound in the alkyl mercury group, *i. e.*, a methylmercury compound called Cyano-(methylmercuri)guanidine or Methylmercury dicyandiamide.

3. Alkyl mercury is a highly toxic substance. Once ingested, it moves rapidly through the body and is absorbed, rather than passed off, by the body. As the hog ate the treated grain every day, the mercury level in its body increased and remained there at the time when the hog was slaughtered. When the Hucklebys began eating the meat from the hog, the level of alkyl mercury in their bodies gradually increased also. However, because alkyl mercury poisoning normally affects only the young, the adult Hucklebys, Ernest and Lois, escaped injury.

4. The oldest Huckleby child, Dorothy Jean, has impaired speech, locomotion, sight and use of her hands. She has undergone rehabilitation, but the effects of the poisoning that she now manifests are permanent disabilities.

The son, Amos, is blind, his speech is greatly impaired, he walks with great uncertainty, and he cannot use his hands effectively. His disabilities are also permanent.

The other daughter, Ernestine, and the baby, Michael, are blind and neither can walk or talk. These conditions are permanent.

After an administrative claim was denied, plaintiffs brought this suit under the Federal Tort Claims Act.[5] Their main claims of negligence were that the failure of PRD to require a label with an adequate warning of the danger of food-chain poisoning, and the failure to cancel the registration of Panogen 15 on the basis of known facts, were a proximate cause of the injuries; that the registration would have been cancelled had PRD followed an Interdepartmental Agreement among the Departments of Agriculture, Interior and HEW; and that the number of Public Health Service objections to PRD over the registration of products containing organic mercury compounds should have led to testing and investigation on the adequacy of the labels.

The Government denied any negligence. It also alleged that PRD employees were exercising due care in the administration of the statute and regulations and hence it was exempt from liability under the exception in 28 U.S.C.A. § 2680(a), and that liability was likewise barred by the discretionary function exception of § 2680(a).

After a lengthy trial the district court found for the Government. The court's opinion essentially found that PRD had evaluated the label in accordance with FIFRA and the regulations as far as specific label items required by the statute and regulations were concerned; that PRD had discretion in that it must make policy judg-

ments as to necessary label contents beyond those specific requirements; that the decision on the need for further testing and investigation of the alkyl mercury compound was a determination within the discretion of the Director of PRD; and that argument as to the failure of PRD to implement the Interdepartmental Agreement was immaterial because cancellation of Panogen's registration was within the Director's discretion.

The court concluded, inter alia, that where the agency performed its duties under the statute, and where the evaluation of the label and the decision to re-register the product involved discretion, even if that discretion was abused, 28 U.S.C.A. § 2680(a) applied and the Government was immune from suit. The action was dismissed and this appeal followed.

I

*Federal Regulation of Pesticides*

FIFRA provides the basic framework for the federal regulation of "economic poisons" in interstate commerce.[6] The Act requires that every economic poison must be registered with the Secretary of Agriculture before it can be marketed in interstate commerce. 7 U.S.C.A. § 135b(a). In order to have his product registered under the Act, an applicant had to demonstrate to the

5. The background of other litigation and further details about the controversy appear in *First National Bank in Albuquerque v. Nor-Am Agricultural Products, Inc.*, 537 P.2d 682 (N.M. Ct.App.).

6. The Act defines an "economic poison" as follows, 7 U.S.C.A. § 135(a):
(1) any substance or mixture of substances intended for preventing, destroying, repelling, or mitigating any insects, rodents, nematodes, fungi, weeds, and other forms of plant or animal life or viruses, except viruses on or in living man or other animals, which the Secretary shall declare to be a pest, and
(2) any substance or mixture of substances intended for use as a plant regulator, defoliant, or dessicant.
A fungicide is an economic poison. See 7 U.S.C.A. § 135(a), (d). Throughout this opinion the terms "economic poison" and "pesticide" will be used interchangeably.

The first attempt at federal regulation of pesticides was the Insecticide Act of 1910 which prohibited the interstate sale of any insecticide or fungicide which was adulterated or misbranded within the meaning of the statute. 36 Stat. 331 (1910). This Act was repealed when FIFRA was enacted in 1947. 61 Stat. 163.

The passage of FIFRA added several important components to the federal scheme of pesticide regulation including controls over label language and the requirement that an economic poison be registered with the Secretary of Agriculture before it could be marketed in interstate commerce. See generally H.Rep. 313 (80th Cong., 1st Sess.), 1947 U.S.Code & Cong. Serv., pp. 1200–06. The Act was substantially strengthened by amendments in 1964. 78 Stat. 197; and see H.Rep. 1125 (88th Cong., 2d Sess.), 1964 U.S.Code Cong. & Admin.News, pp. 2166–67. Further amendments have occurred but they came after the period with which we are concerned.

satisfaction of the Secretary[7] that his economic poison is effective as claimed and that it meets the safety requirements of the Act. 7 U.S.C.A. § 135b(b).

The Secretary delegated his authority to the Director of PRD. 7 CFR § 362.3 (Jan. 1, 1970).[8] In order for a product to be registered, the manufacturer was required to submit to PRD an application for registration which included copies of the proposed labeling and the results of tests which measured the product's toxicity and efficacy. 7 U.S.C.A. § 135b(a); 7 CFR § 362.10(c) (Jan. 1, 1970). The application was evaluated by three separate groups within PRD. First, the "new chemicals evaluation staff" reviewed the label for accuracy in such areas as ingredient statements, chemical composition and chemical nomenclature. Second, the "product evaluation staff" reviewed the test data and the labels for the purpose of evaluating statements on the poison's effectiveness in the control of pests and other plant diseases. Third, the "pesticides safety evaluation staff" reviewed the toxicological data relating to the product's safety with respect to man and animals, and determined which warnings and precautionary statements should be placed on the label. When the poison's labeling was approved and the Secretary found that the claims for the product were warranted, he registered the product. 7 U.S.C.A. § 135b(b).

This registration was good for five years. At the end of this time the Secretary was authorized to cancel the registration, or, if requested by the applicant in accordance with the regulations, the pesticide could be re-registered for another five-year period. 7 U.S.C.A. § 135b(f) (1976 Supp.). However, at any time when an economic poison's labeling was found not to comply with the Act, the Secretary could suspend or cancel the product's registration. 7 U.S.C.A. § 135b(c) (1976).

*Mercury, Methylmercury and Panogen 15*[9]

Mercury is often combined with organic chemical compounds to form what are known as "organic mercurials." These serve a wide variety of purposes. In agriculture, it was discovered that organic mercurials were effective as fungicides and that methylmercury was one of the most effective. The first reported use of an organic mercurial as a seed treatment to kill plant fungi was reported in 1913. This practice became widespread in the United States and other developed parts of the world by the 1930s.

A typical mercury fungicide will contain both active and inert ingredients. The active ingredient is often a methylmercury combined with another chemical compound in such a way that the active ingredient is then water soluble. This facilitates the fungicide's application on seeds during the treatment process. For example, the only active ingredient in Panogen 15 is Cyano(methylmercuri)guanidine which is a combination of methylmercury and guanidine. This compound comprises 2.2% of the Panogen 15 by weight. The remainder (97.8%) is made up of inert ingredients.

Panogen 15 was first registered with the Department of Agriculture in 1953 and has been re-registered several times since then, mostly recently in 1968. Panogen's registration was suspended in January, 1970, primarily due to the Huckleby incident.[10]

The Panogen 15 sold to the Golden West Seed Company came in 54-gallon drums. The drum label shown to have been in use

---

7. On December 2, 1970, the administration of FIFRA was transferred from the Secretary of Agriculture to the Administrator of the Environmental Protection Agency pursuant to Reorganization Plan No. 3 of 1970, 84 Stat. 2086.

8. In citing the regulations we refer to those of the Department of Agriculture in effect at the pertinent time.

9. The scientific data discussed in this part were developed by an expert witness of the plaintiffs and are not in dispute.

10. *See Nor-Am Agricultural Products, Inc. v. Hardin*, 435 F.2d 1133, reversed on procedural grounds on rehearing *en banc*, 435 F.2d 1151 (7th Cir.), cert. dismissed, 402 U.S. 935, 91 S.Ct. 1399, 28 L.Ed.2d 870.

at about the time of these injuries is reproduced in the appendix to this opinion.[11] The most pertinent parts of the label to note for our purposes are the following warnings under the caption "Caution":

This product is toxic to fish and wildlife. Keep out of any body of water. Treated seeds exposed on soil surface will be hazardous to birds and other wildlife. Rinse equipment and containers and dispose of wastes by burying in noncrop lands away from water supplies.

Further down under the heading "Precautions" was a statement directed to persons using Panogen 15 to treat seeds. This statement referred to the contents of the tags to be placed on bags of treated seed, and it read in part:

. . . The statement 'Do not use this seed for food, feed or oil purposes' must appear in 8 point or larger.[12]

The plaintiffs claim that these and other label components were insufficient to apprise Golden West of the possibility of food-chain poisoning, thus causing their injuries. The alleged negligence of PRD in approving Panogen's labeling is a primary part of the plaintiffs' case.

## II

### *The Discretionary Function Exception*

The district court's ruling was based on 28 U.S.C.A. § 2680(a), which provides that:

§ 2680. Exceptions

The provisions of this chapter and section 1346(b) of this title shall not apply to—

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, *or based upon the exercise or performance or the failure to exercise or perform*

*a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.* (Emphasis added).

The controlling issues on this appeal concern only the emphasized part of § 2680(a), the discretionary function exception. We go directly to these issues since the discretionary function exception is a jurisdictional bar, if it applies. *Smith v. United States,* 546 F.2d 872 (10th Cir. 1976).

In challenging the adverse ruling under § 2680(a), plaintiffs argue that PRD was not engaged in the exercise of a protected discretionary function in the evaluation and choice of warning and direction language for Panogen 15 labels; that FIFRA and the regulations do not contemplate that public policy judgments will be made by PRD regarding precautionary language; that the record shows that no risk-benefit judgment was made by PRD in such evaluation and choice of the label language; and that the district court erred in finding that PRD judgment on "necessary and if complied with adequate" labeling involved a policy making choice, this finding not being supported by the record. Further, plaintiffs contend that the omissions of PRD personnel in marshalling and submitting facts to the Secretary or his surrogate for consideration of cancellation or suspension of Panogen's registration were unprotected as discretionary functions. Plaintiffs' primary reliance is placed on *Griffin v. United States,* 500 F.2d 1059 (3d Cir.).

Of course, *Dalehite v. United States,* 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427, is our main guide on the discretionary function question. In holding that the functions of Government personnel involved in the nitrate fertilizer export program preceding the Texas City explosion were within the exception, the Court stated, id. at 35–36, 73 S.Ct. at 968:

---

11. The parties had some difficulty in locating the actual label on the 54-gallon drum sent to Golden West. However, the record supports the conclusion that the label in the appendix is an exact copy of the label that was placed on that drum. See VII R. 141 (Pl. Ex. 5); XVII R. 667; XVIII R. 933.

12. The inclusion of this language on the label of treated seed was required by regulations issued under the Federal Seed Act. 7 U.S.C.A. § 1561 *et seq.*; see 7 CFR § 201.31a(d) (Jan. 1, 1970). The treated seed itself is not an economic poison within the meaning of FIFRA.

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

Plaintiffs argue vigorously that *Griffin v. United States*, 500 F.2d 1059 (3d Cir.), calls for rejection of the Government's claim of immunity under § 2680(a). There the plaintiff alleged negligence in Government approval of a lot of Sabin oral polio vaccine which later proved to be substandard and produced severe injury. The Third Circuit held that the actions of HEW's Division of Biologic Standards in approving the lot of vaccine were in violation of agency regulations and that at issue was a scientific—but not policy making—determination as to whether each of the criteria listed in the regulation was met.[13] Thus the discretionary function exception was held not to apply.

We agree with the reasoning and the result in the *Griffin* case. However, in order to determine whether these principles call for rejection of the discretionary function argument in our case, we must focus on the requirements of the statute and the regulations involved here.

There are portions of the requirements on labeling that are specific and mandatory.

Here a Category I poison ("highly toxic to man") was involved and mandatory label elements included the skull and crossbones, the word "poison" prominently in red on a background of distinctly contrasting color, and a statement of an antidote for the economic poison. 7 U.S.C.A. § 135a(a)(3); 7 CFR § 362.116(b)(2) (Jan. 1, 1970). However, these parts of the labeling are not at issue on this appeal.[14]

Instead, plaintiffs' claims of negligence and omissions concern other labeling requirements not involving such specific, mandatory items. These other requirements as to warnings, precautionary language and "directions for use" were phrased in terms of general policy standards to be applied by the agency.[15] For example, 7 U.S.C.A. § 135(z)(2)(c) and (d) provided that an economic poison is "misbranded":

(c) if the labeling accompanying it does not contain directions for use which are *necessary and if complied with adequate for the protection of the public*;

(d) if the label does not contain a warning or caution statement which may be *necessary and if complied with adequate to prevent injury* to living man and other vertebrate animals, vegetation, and useful invertebrate animals; (Emphasis added).

In prescribing required warnings and caution statements for labels, the regulations also incorporated the same general standard, *i. e.*, that of statements "necessary and, if complied with, adequate to prevent injury  .  .  ."[16]

Thus, the statute and the regulations staked out only generalized policy standards

---

13. The court also held that in disregarding some factors specified by regulation, there was a violation of a nondiscretionary command in the regulations, placing the actions outside the exception. 500 F.2d at 1066–68.

14. There was a claim of alleged negligence asserted in the trial court pertaining to the antidote statement, but this is not argued on appeal.

15. These standards were applied when Panogen's application for registration was submitted with the proposed labeling as required.

See 7 U.S.C.A. § 135b(a)(3); 7 CFR § 362.10(c) (Jan. 1, 1970). See also the testimony of Dr. Cueto on the consideration of proposed labels and changes required to make them adequate. XVIII R. 932. Numerous changes requested and incorporated on the Panogen label during its 17 year registration are reflected in Defendant's Ex. A, the registration jacket.

16. 7 CFR § 362.9 (Jan. 1, 1970) provided that:
Warning or caution statements, which are *necessary and, if complied with, adequate to*

for the precautions, warnings and directions for use. To enforce these standards, and give content and meaning to them, the agency was required to make policy judgments in evaluating the adequacy of the labeling. See *Stearns Electric Paste Co. v. EPA,* 461 F.2d 293, 310 (7th Cir.); *Continental Chemiste Corp. v. Ruckelshaus,* 461 F.2d 331, 336 (7th Cir.). We feel this is true as to all components of the labeling complained of by the plaintiffs—the warnings, precautions and directions for use. Thus this case is unlike *Griffin* where scientific measurement against given specific standards was involved—not a determination in general terms for the protection of the public safety.[17]

We recognize that the Federal Tort Claims Act waives the Government's immunity in sweeping language. *United States v. Yellow Cab Co.,* 340 U.S. 543, 547, 71 S.Ct. 399, 95 L.Ed. 523. Moreover, the exceptions to the waiver are to be narrowly construed. See *Dalehite,* supra, 346 U.S. at 31 & n. 24, 73 S.Ct. 956; *Smith v. United States,* 546 F.2d 872, 876 (10th Cir. 1976). We are admonished that in interpreting the exceptions, we should include only those circumstances within the words and reason of the exception. *Dalehite,* supra, 346 U.S. at 31, 73 S.Ct. 956.

We must hold here, however, that the functions on which the negligence claims are founded are within the words and reason of the exception. Evaluation of the labeling did involve scientific as well as public policy considerations, but it was not confined to a narrow scientific function such as evaluating the vaccine under specified criteria in the *Griffin* case. The examination of the labeling under such standards as that of "necessary and if complied with adequate for protection of the public . . ." called for a judgment in the discretionary area. See *Hendry v. United States,* 418 F.2d 774, 783 (2d Cir.); *Coastwise Packet Co. v. United States,* 277 F.Supp. 920 (D.Mass.), aff'd 398 F.2d 77 (1st Cir.), cert. denied, 393 U.S. 937, 89 S.Ct. 300, 21 L.Ed.2d 274. Therefore we must agree with the district court that the discretionary function exception applies.

A further argument made by the plaintiffs is based on the testimony of Dr. Hays, Director of PRD from 1966 to 1970. This testimony was to the effect that risk-benefit analysis, which was utilized by the agency when it made decisions on registration and cancellation of economic poisons, was not used when considering the adequacy of labels. He agreed that the best warning and most adequate directions on labels

*prevent injury to living man and useful vertebrate animals, useful vegetation, and useful invertebrate animals, must appear on the label* in a place sufficiently prominent to warn the user, and must state clearly and in nontechnical language the particular hazard involved in the use of the economic poison, e. g., ingestion, skin absorption, inhalation, flammability or explosion, and the precautions to be taken to avoid accident, injury, or damage. (Emphasis added).

Further 7 CFR § 362.116 (Jan. 1, 1970) provided:

(a) *Requirements of the act.* Section 2.z.(2)(d) of the act provides that an economic poison is misbranded if its label does not contain a warning or caution statement which may be *necessary and if complied with adequate to prevent injury to living man and other vertebrate animals,* vegetation, and useful invertebrate animals . . .

\* \* \* \* \* \*

(c) *Miscellaneous Provisions.* (1) Warning or caution statements on the labels of economic poisons must give concise and easily understood warnings as to the hazards asso-

ciated with the use of the products, together with instructions to be followed to insure adequate protection . . . (Emphasis added).

In particular, we note that in dealing with warnings and precautions for organic mercury compounds the regulations have a significant provision that "[d]ue to wide variation in characteristics *each product must be considered individually.*" 7 CFR § 362.116(d) (*Mercury Compounds*) (iii) (Jan. 1, 1970) (Emphasis added).

See also 7 CFR § 362.105(b)(5) (Jan. 1, 1970), pertaining to directions for use, which requires that the directions include:

*Any other pertinent information which in the opinion of the Director is necessary for the protection of the public.* (Emphasis added).

17. The Third Circuit's opinion pointed out that the DBS function was not to determine if the lots of vaccine were safe for release, but instead was the duty to ascertain if specific neurovirulence standards of the regulation had been met. See 500 F.2d at 1066 n. 16A.

would be required "regardless of toxicity or [the] risk-benefit ratio." XVIII R. 825–26. The plaintiffs say that the testimony shows that no discretionary function was exercised with respect to labeling requirements. We cannot agree. The fact that the highest standards would be observed in judging the adequacy of labels does not alter our view that the generalized requirements for labels "necessary and if complied with adequate for protection of the public," 7 U.S.C.A. § 135(z)(2)(c), necessitated the exercise of discretionary judgment.

Plaintiffs press one final argument which is unrelated to labeling but deals instead with the authority to suspend or cancel the product's registration. They contend that omissions of PRD personnel in failing to marshal and submit facts to the Secretary or his delegate for a decision on cancellation were not protected as discretionary functions. Plaintiffs say that there was nothing more than a pro forma compliance with the statute in 1968 when Panogen 15 was reregistered and thus no policy judgment was exercised at all.

■ We note first that the decision-making as to possible suspension or cancellation does implicate a policy choice based on substantive standards of product safety in terms of protection of the public and impact on living man. See *Continental Chemiste Corp. v. Ruckelshaus,* supra, 461 F.2d at 335–36. Whether such discretion is exercised and possibly abused, or whether there is a failure to exercise the discretion, such acts or omissions related to the cancellation function are within the terms of the exception provided by § 2680(a).

■ We feel the claims and proof relating to alleged failure to marshal and submit data to the Secretary or to his surrogate, the Director of PRD, fall in the same category.[18] These actions are an integral part of the process for any possible cancellation or suspension of a registration. If we accepted plaintiffs' argument that such acts of negligence or such omissions of staff personnel are unprotected, then

.   .   . the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs or fails to perform a causal step, each action or nonaction being directed by the superior, exercising, perhaps abusing, discretion.

*Dalehite,* supra, 346 U.S. at 36, 73 S.Ct. at 968.

In sum, we must agree with the ruling of the district court.[19] As Judge Bratton concluded his opinion on this tragedy, he expressed these thoughts with which we are in full agreement and which we hope will move those who can do so to provide special relief:

It is with regret that the issues in this case are resolved against the plaintiffs. The Huckleby tragedy is very painful to observe, and the damage to the Huckleby children defies adequate articulation. The additional burdens placed upon the family by the accident are so great that they compel the hope that private relief will be available to this stricken family through Congressional action.

AFFIRMED.

Appendix to follow.

---

**18.** Actually at trial the plaintiffs established through the testimony of the officials that the Director himself and his Assistant had knowledge of the facts about mercury dangers which are discussed by the plaintiffs in connection with this issue. Thus the argument in essence attacks the Director's failure to cancel or suspend the registration on the basis of these facts.

There is a related argument that there was further proof of negligence, unprotected by the discretionary function exception, in the failure of the Department of Agriculture to implement a "Memorandum of Agreement between Secretary of Agriculture, Secretary of the Interior, and Secretary of Health, Education and Wel-

fare," 29 Fed.Reg. 5808 (May 1, 1964). The argument is that the Department of Agriculture failed to implement the agreement which called for exchange of information and conferences on pesticide problems. The district court did find that the agreement was never implemented with regard to Public Health Service objections to pesticides. Nevertheless, we agree with the court that the agreement did not modify the substantive provisions of FIFRA. The function of cancellation remained unchanged, and any omissions or negligence in exercising that function were protected by § 2680(a).

**19.** As was ordered as to costs in the trial court, the parties will bear their own costs on this appeal.

## APPENDIX

*Left Panel*

## GENERAL INFORMATION

Panogen 15 is recommended for the control of diseases caused by organisms carried on the seed, such as: Seed-borne stinking smut or bunt of wheat, oat smut and seed-borne oat blight (Helminthosporium victoriae), covered smut, black loose smut and stripe of barley, stem and covered smut of rye, seed-borne root rots of cereals, scab of cereals (Fusarium blight), loose and covered kernel smut of sorghums, black leg of sugar beet, seedling blight of flax, seedling blight of rice, seed-borne diseases and seed decay of peanuts, seed-borne rust and Alternaria of safflower. It also reduces infection from surface seed-borne anthracnose and usually reduces seed decay and damping-off or sore-shin of cotton. Panogen 15 reduces seed decay and seedling blight of corn, soybeans, peas, and beans. Control of seed diseases and seedling blights will usually result in increased stands and yields.

## CAUTION

This product is toxic to fish and wildlife. Keep out of any body of water. Treated seeds exposed on soil surface will be hazardous to birds and other wildlife. Rinse equipment and containers and dispose of wastes by burying in non-crop lands away from water supplies.

## PRECAUTIONS

Wear goggles or face shield to protect eyes from splashing while handling fungicide.

Do not breathe fumes from treated seed or from disinfectant.

Do not apply this fungicide to seed indoors unless there is thorough ventilation.

Do not handle the fungicide or treated seed with bare hands. Wash off promptly with plenty of soap and water any fungicide that accumulates on the skin.

Do not eat or smoke while using this fungicide. Wash hands before eating or smoking.

Seed treated with Panogen 15 must be labeled as follows: "This seed treated with methyl-mercury dicyandiamide" in 8 point or larger. The actual rate of treatment must also be stated or the words "at the rate recommended by the manufacturer." The words "Poison Treated" must appear in type not less than ¼" in red on a white background and a skull and crossbones at least ½" must be shown. The statement "Do not use this seed for food, feed or oil purposes" must appear in 8 point or larger.

Treated seed should be stored in well-ventilated areas. Do not store near food or feed supplies. Do not use bags or other containers which have contained treated seed for packaging food or feed.

Keep container tightly closed except when removing contents. Store in a well-ventilated area.

Before discarding empty container wash thoroughly with water and detergent. Discard in a safe place.

Panogen 15 may be somewhat corrosive to aluminum, copper, zinc, or alloys of these metals. Do not permit solutions of Panogen 15 to remain in contact with these metals for extended periods of time.

THIS LABEL MUST NOT BE REMOVED OR RENDERED ILLEGIBLE.

## DO NOT RE-USE CONTAINER

*Middle Panel*

# Panogen® 15

## LIQUID SEED TREATMENT
### READY TO USE FUNGICIDE

FOR WHEAT, OATS, BARLEY, COTTON, FLAX, SORGHUM, RICE, RYE, SUGAR BEETS, PEANUTS, SOYBEANS, SAFFLOWER, CORN, BEANS AND PEAS

U.S.D.A. Registration No. 2139-6

Active Ingredient: Cyano(methylmercuri)guanidine*............................ 2.2%
(Mercury equivalent 1.5%)
Inert Ingredients .................................................................................. 97.8%
   *Methylmercury dicyandiamide ............................................ 100.0%

### POISON
### DANGER
### KEEP OUT OF THE REACH OF CHILDREN

This liquid is poisonous if inhaled, swallowed, or absorbed through skin. Do not breathe vapors. Do not get in eyes, on skin or on clothing. Handle carefully. May produce delayed chemical burns.

### ANTIDOTE:

**Internal:** If swallowed give milk or white of egg beaten with water, then a tablespoon of salt in a glass of warm water, and repeat until vomit fluid is clear. Repeat milk or white of egg beaten with water. CALL A PHYSICIAN IMMEDIATELY!

**External:** If spilled on skin, wash off immediately with large amounts of soap and water. If in eyes, flush with water for at least 15 minutes and get medical attention.

SEE LEFT PANEL FOR ADDITIONAL PRECAUTIONS.

**Net Contents:**

**MORTON CHEMICAL COMPANY**
DIVISION OF MORTON INTERNATIONAL, INC.
110 N. WACKER DRIVE · CHICAGO, ILLINOIS 60606

*Right Panel*

# DIRECTIONS FOR USE

Seed should be cleaned and must be well cured before treatment.

Panogen 15 is delivered ready for use in any Panogen Seed Treater.

Panogen 15 can be used in other treaters designed to apply liquids at the appropriate dosage rates.

# RECOMMENDED DOSAGES:

Wheat, oats, barley, rye, sorghum.....................................½ fl. oz. per bu.

Cotton
    Acid delinted ......................................................2 fl. oz. per 100 lbs.
    Machine delinted ...................................................3 fl. oz. per 100 lbs.
    Fuzzy ................................................................4½ fl. oz. per 100 lbs.

Rice ........................................................................½ fl. oz. per bu.

Flax ........................................................................1½ fl. oz. per

Beet seed (segmented)..............................................4 fl. oz. per 100 lbs.

Peanuts .....................................................................2¼ fl. oz./100 lbs.

Safflower* ..................................................................1½-2 fl. oz./100 lbs.

Field corn, sweet corn.....................................................2-4 fl. oz./100 lbs.

Beans, peas, soybeans** .............................................3-4 fl. oz./100 lbs.

  *For best results treat at least 24 hours before seeding.
**Do not use Panogen 15 for treatment of Garbanzo beans.

For extended periods of storage in large bins, seed should be aerated.

## IMPORTANT: READ BEFORE PURCHASE OR USE

Purchase or use of this product shall constitute acceptance of the following terms of sale. Morton Chemical Company (Morton) warrants that this product conforms to the chemical descriptions on this label and is reasonably fit for the purposes specified hereon. By way of limitation but not in derogation of the directions and statements printed on this label, Seller makes no warranty and no represent and Morton makes no further warranty or representation, expressed or implied, including but not limited to any warranty as to MERCHANTABILITY, and no agent of Morton is authorized to do so except in writing, with a specific reference to the foregoing warranty. Since neither Seller nor Morton has any control over the handling, storage, use or conditions of use of this product, Buyer or user assumes all risks and liability arising from handling, storage or use of this product under abnormal conditions or not in strict compliance with the directions and precautionary statements hereon. All claims related to the purchase, handling, storage or use of this product shall be barred unless written notice is given to Morton within 30 days after the loss is discovered. Liability of the Seller or Morton for any damages arising from a breach of this warranty shall be limited to exclude consequential commercial damages.

Product of U.S.A.                                   Printed in U.S.A.