Beverly Ann GRAY

v.

**The UNITED STATES of America and Eli Lilly and Company.**

**Civ. A. No. 74–H–1392.**

United States District Court,
S. D. Texas,
Houston Division.

Feb. 2, 1978.

Jamail & Gano, Joseph D. Jamail, Jr., Houston, Tex., for plaintiff.

R. Burton Ballanfant, Asst. U. S. Atty., Houston, Tex. and James P. Klapps, Civil Division, Dept. of Justice, Washington, D. C., for defendant United States of America.

Mehaffy, Weber, Keith & Gonsoulin, O. J. Weber, Jr., Beaumont, Tex., and Shook, Hardy & Bacon, Lane D. Bauer and Larry R. O'Neal, Kansas City, Mo., for defendant Eli Lilly and Co.

## MEMORANDUM AND ORDER

STERLING, District Judge.

This is a civil damage suit brought by the plaintiff, Beverly Ann Gray (Gray), against a drug company, Eli Lilly and Company (Lilly), and the United States. Plaintiff alleges that she has been harmed by a drug diethylstilbestrol (DES), taken by her mother during Gray's period of gestation. The pleadings and affidavits indicate that DES was dispensed by physicians in the early 1950's to pregnant women with histories of miscarriages in order to avoid problem pregnancies. It was not until 1971 that the medical community recognized that DES caused cancer in women whose mothers took the drug. This is the basis of Gray's complaint. In essence this is a products liability case. Gray sues Lilly as the manufacturer of the drug and the United States for its approval, through the Food and Drug Administration (FDA), of the sale of DES without warning of its adverse effects. The case is now before the court on motions for summary judgment by Lilly and the United States.

■ Lilly contends that the plaintiff has failed to identify it as the particular manufacturer of the drug, DES, which caused her injury. It is a fundamental principle of products liability law that a plaintiff must prove, as an essential element of his case, that a defendant manufacturer actually made the particular product which caused injury. 1 Hursh and Bailey, *American Law of Products Liability* 2d § 1:41 (1974); 63 Am.Jur.2d, *Products Liability* § 5 p. 12 (1972). In *Wetzel v. Eaton Corporation*, 62 F.R.D. 22 (D.Minn.1974), the plaintiff sued two corporations which were the only suppliers of a defective tractor part prior to the injury in question. The plaintiff, however, could not produce any evidence identifying the particular defendant that supplied the defective tractor part. The court held that summary judgment was appropriate for the moving defendant since it would be only speculation and conjecture that might link any one of the two defendants to the defective part. 62 F.R.D. at 28.

■ It is apparent that Gray is unable to identify Lilly as the particular manufacturer of the DES taken by her mother. In 1953 and 1954 there were at least one hundred separate companies offering to sell some form of DES. (Affa. Carl M. Leventhal, M.D.). Gray, of course, cannot of her own knowledge identify which of these one hundred companies manufactured the drug taken by her pregnant mother. Gray's mother has testified that she cannot identify what brand of DES she took, nor can she remember the shape, color or dosage of the DES ingested. (Mrs. Gray's Dep. at 88, 206–207). Dr. Charles F. Beckert who treated Mrs. Gray during her pregnancy and who prescribed DES for her use from October 19, 1953 to April 26, 1954 cannot identify the manufacturer of the DES taken by Mrs. Gray. (Dr. Beckert's Affa. at 1–2). Mr. Charles Wesley Gray, plaintiff's father, does not remember the size, shape, color or manufacturer of the DES taken by Mrs. Gray. (Mr. Gray's Dep. at 27). Mr. Vernon C. Thompson, former co-owner of the drug store where Mrs. Gray's DES prescriptions were filled, cannot identify which manufacturer's DES was used to fill Mrs. Gray's prescriptions. (Thompson Affa. at 2). The present owner of such drug store, Hugh Allen Johnson, destroyed all prescription records for the years prior to 1956 due to insufficient storage space, and cannot identify the manufacturer of the DES taken by Mrs. Gray. (Johnson Dep. 28–29, 33–34). It has been over three years since Gray filed her original complaint, and well over a year since the critical issue of the manufacturer's identity was raised by Lilly's amended motion for summary judgment. Gray has had ample time for discovery, but has failed to provide any proof on this essential element of her case. Lilly's motion for summary judgment must be granted.

The United States has moved for summary judgment on the basis of a statutory exception to the Federal Tort Claims Act. The exception relied upon is in 28 U.S.C. § 2680(a) which states:

"The provisions of this chapter and section 1346(b) of this title shall not apply to . . .

"(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."

■ It is clear that this statutory exception from the Federal Tort Claims Act bars recovery for acts which constitute discretionary functions of government officials. In her original complaint, plaintiff alleges that the United States government, through its agent, the Food and Drug Administration (FDA), was negligent in failing properly to test DES, in failing to warn of the adverse effects of DES, and in approving DES and representing that it was safe. The new drug provisions of the Federal Food, Drug and Cosmetic Act state that a drug which is not generally recognized by qualified experts as safe and effective[1] under the conditions for which it is prescribed, recommended or suggested, may be shipped in interstate commerce only if an approval[2] of a new drug application is effective for that drug. 21 U.S.C. §§ 321(p), 355. The function of the Food and Drug Administration was to approve the new drug application for DES pursuant to 21 U.S.C. § 355(d). That section required the Secretary to determine whether:

(1) the investigations, reports of which are required to be submitted to the Secretary pursuant to subsection (6), do not include adequate tests by all methods reasonably applicable to show whether or not such drug is safe for use under the conditions prescribed, recommended, or suggested in the proposed labeling thereof;

(2) the results of such tests show that such drug is unsafe for use under such conditions or do not show that such drug is safe for use under such conditions;

(3) the methods used in, and the facilities and controls used for, the manufacture, processing, and packing of such drug are inadequate to preserve its identity, strength, quality, and purity; or

(4) upon the basis of the information submitted to him as part of the application, or upon the basis of any other information before him with respect to such drug, he has insufficient information to determine whether such drug is safe for use under such conditions; . . . he shall issue an order refusing to permit the application to become effective.[3]

The applicable regulations in effect prior to 1954 which governed new drug applications were expressed in general terms. CFR §§ 1.109–1.114 (1955). The present regulations are somewhat more specific, not allowing approval of a new drug application if it does not include "adequate tests by all methods reasonably applicable" to show whether or not the drug is safe for its proposed uses. 21 CFR 314.111(a)(1).

■ The issue thus is whether the FDA's evaluation and issuance of new drug applications for DES by 1953 constituted a discretionary function within the ambit of 28 U.S.C. § 2680(a). If such action was discretionary, Gray is barred from recovery under

1. Prior to the passage of the "Drug Amendments of 1962," P.L. 87–781, 76 Stat. 781, a "new drug" was defined by 21 U.S.C. § 321(p) as one which was "not generally recognized . . . as safe" only. Effectiveness was not involved.

2. The Act, 21 U.S.C. § 355, formerly required that there be an "effective" new drug application for such new drugs before they could be shipped in interstate commerce. When the definition of a new drug was amended by the

"Drug Amendments of 1962" to include those drugs "not generally recognized . . . as safe and effective," all new drug applications which were "effective" on October 19, 1962, were deemed "approved". See note ff, 21 U.S.C. § 321(p).

3. 21 U.S.C. 355(d) was amended by P.L. 87–871 in 1962 to include other factors that might lead the Secretary to refuse a new drug application. Such additional criteria are not relevant here.

the Federal Tort Claims Act. Placed in such a position, Gray has argued strenuously that the FDA's action was one of perfunctory scientific deduction and not that of making discretionary policy decisions. The government on the other hand places the FDA in a more paternal position with great latitude to decide what is safe for the public. Whether a government's function is discretionary or ministerial is rarely obvious for hardly any action of any import lacks a judgmental element. Therefore, the matter becomes one of degrees: What degree of discretion would put an act within the exception from liability found in 28 U.S.C. § 2680(a)? The landmark case of *Dalehite v. United States*, 346 U.S. 15, 73 S.Ct. 956, 97 L.Ed. 1427 (1953), probed the legislative history of the statutory exception and provides this instructional language:

"It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the 'discretionary function or duty' that cannot form a basis for suit, under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications, or schedules of operations. Where there is room for policy judgment and decision, there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable. If it were not so, the protection of § 2680(a) would fail at the time it would be needed, that is, when a subordinate performs a casual step, each action or nonaction being directed by the superior exercising perhaps abusing, discretion." 346 U.S. at 35–36, 73 S.Ct. at 968.

The discretionary acts sought to be exonerated by § 2680(a) must be conduct that brings to bear policy judgments, the balancing of a risk-benefit formulae. It is in those problem areas where the public imposes upon its decision makers both a duty and an unrestrained liberty to consider and construct a solution, that the results of such deliberations should be protected. Other-

wise the threat of future litigation might intimidate the creativity of those decision makers burdened with the duty of working out a problem. Such is the situation before this court. The FDA was given a general statutory mandate to assure the public that a marketed drug is safe for use. No broader standard of duty is imposed upon the FDA than the three words, safe for use. See 21 U.S.C. § 355. There are no particular scientific tests or measuring sticks by which the FDA must qualify a new drug. Instead the FDA is given the liberty to consider all factors it deems relevant in its own determination of a drug's safety for the public. The severity of the task delegated to the FDA demands that such an agency be given the freedom effectively to exercise its expertise. Congress has chosen the FDA to be the decision maker in this area, and its judgments in approving a drug as safe for use must be beyond private scrutiny and litigation.

The case of *First National Bank in Albuquerque v. United States*, 552 F.2d 370 (10th Cir. 1977), strongly supports the government's position. There the plaintiff brought suit against the government to recover for tragic injuries to a family caused by their consumption of hogs which had been fed mercury treated grain. The mercury fungicide had been labeled, such labeling being approved by the United States Department of Agriculture, pursuant to the Federal Insecticide, Fungicide and Rodenticide Act (FIFRA). The Court of Appeals held that the government's act of registration of the pesticide involved discretion, even if it was abused, and that the discretionary act exemption in § 2680(a) immunized the government from suit. It is important to note the language of the statutory requirements that the Department of Agriculture was bound to in the *Albuquerque* case. FIFRA provided general policy standards to be applied by the agency. 552 F.2d at 375. The statutory language called for a rejection of the labeling, if it lacked directions that were "necessary and if complied with adequate for the protection of the public" or warnings that were "neces-

sary and if complied with adequate to prevent injury to living man and other vertebrate animals, vegetation, and useful vertebrate animals." 7 U.S.C.A. § 135(z)(2)(c) and (d), see 552 F.2d at 375. Such language gave the Department of Agriculture great room to exercise its discretion. In fact, the general character of the statutory standards imposed is a direct indicator of the discretionary nature of the acts they demand. A comparison of the statutory standards in the *Albuquerque* case with that in this case, "safe for use", signals a determination that any acts ensuing from such language are discretionary.

Plaintiff Gray heavily relies on the case of *Griffin v. United States*, 500 F.2d 1059 (3rd Cir. 1974), in her attempt to avoid the § 2680(a) discretionary act exemption. ·In *Griffin* the plaintiff sued the government for its approval of vaccine lots for release, which rendered her a quadraplegic. The court held that § 2680(a) did not bar suit in view of the *specific detailed* scientific criteria listed in the regulation governing the agency.[4] The court stated:

"At issue was a scientific, but not policy making, determination as to whether each of the criteria listed in the regulation was met and the extent to which each factor accurately indicated neurovirulence. . . . It had no authority to formulate new policy in the immunization program." 500 F.2d at 1066.

The court in footnote 16A went further to limit its holding to leave vulnerable only those acts of such technical, scientific evaluation:

**4.** 42 C.F.R. § 73.114(b)(1)(iii) provides:

(iii) Determination of neurovirulence. At the conclusion of the observation period comparative histopathological examinations shall be made of the lumbar cord, cervical cord, lower medulla, upper medulla and mesencaphalon of each monkey in the groups injected with virus under test and those injected with the NIH Reference Attenuated Poliovirus, except that for animals dying during the test period, these examinations shall be made immediately after death. The animals shall be examined to ascertain whether the distribution and histological nature of the lesions are characteristic of poliovirus infection. A comparative evaluation shall be made of the evidence of neurovirulence of the virus under test and the NIH Reference

"The function of DBS was not, as stated in the dissent, to determine whether lots were 'safe for release to the public.' Its specific duty under the regulation was to ascertain whether the neurovirulence standard of the regulation had been met. If so, the lot could be released. This function of comparing the test lot with the reference strain did not 'constitute the planning of the method and procedures by which DBS would undertake to perform regulatory duty.' Dissenting opinion at 7. The method and procedures to be followed by DBS were spelled out specifically and in detail by the regulations promulgated by the Surgeon General with the advice of his committee." 500 F.2d at 1066 n. 16A.

Therefore it is obvious that the discretionary standard, "safe for release to the public", which the *Griffin* court noted as being lacking as to the agency there involved is quite prevalently imposed upon the FDA in "safe for use". The *Albuquerque* decision distinguished *Griffin* on the strikingly different and specific regulatory duties mandated:

"Thus this case is unlike *Griffin* where scientific measurement against given specific standards was involved—not a determination in general terms for the protection of the public." 552 F.2d at 376.

In light of the above reasons, this Court is of the opinion that the conduct of the FDA was discretionary within the terms of 28 U.S.C. § 2680(a), and therefore the plain-

Attenuated Poliovirus with respect to (a) the number of animals showing lesions characteristic of poliovirus infection, (b) the number of animals showing lesions other than those characteristic of poliovirus infection, (c) the severity of the lesions, (d) the degree of dissemination of the lesions, and (e) the rate of occurrence of paralysis not attributable to the mechanical injury resulting from inoculation trauma. *The virus pool under test is satisfactory for poliovirus vaccine manufacture only if 80 percent of the animals in each group survive the observation period and if a comparative analysis of the test results demonstrate that the neurovirulence of the test virus pool does not exceed that of the NIH Reference Attenuated Poliovirus.* [Emphasis supplied.]"

tiff Gray's suit against the government is barred. Therefore it is

ORDERED that defendant Lilly's Motion for Summary Judgment is hereby granted; and that defendant United States of America's Motion for Summary Judgment is hereby granted.