**Ronald ROBERTS, d/b/a Roberts Slate Company**

v.

**UNITED STATES of America.**

**Civ. A. No. 79–49.**

United States District Court, D. Vermont.

Dec. 30, 1981.

Williams & Williams, Neal Vreeland, Poultney, Vt., for plaintiff.

Jerome J. O'Neill, U. S. Atty., D. Vt., Jerome J. Neidermeier, Asst. U. S. Atty., Rutland, Vt., Raymond A. Nowak, Mark S. Landman, James P. Klapps, U. S. Dept. of Justice, Washington, D.C., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

HOLDEN, Chief Judge.

The plaintiff, Ronald Roberts, brought this action under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2674 (1976), seeking to recover for losses he suffered when a slate quarry which he owned, located in South Poultney, Vermont, was destroyed. Roberts alleges that on June 1, 1978 John Rouba, a federal mine inspector, negligently and unlawfully ordered Roberts to use explosives to remove an "overburden" of rock and clay from one of the quarry walls. According to Roberts, he followed Rouba's orders, which included specific instructions about how and where to blast. The ensuing blast, conducted on June 7, 1978, destroyed the quarry. Rob-

erts claims Rouba's actions constituted tortious conduct for which Roberts may recover under the FTCA. The United States disputes both Roberts' factual allegations and his legal basis for recovery. On September 14–16, 1981, the court held a trial without a jury on the issue of liability only.[1] The court's findings and conclusions are entered following the final submission by the parties on December 15, 1981.

## FINDINGS OF FACT

In 1975 Ronald Roberts purchased a slate quarry located in South Poultney, Vermont. Until its destruction in June, 1978, Roberts operated this quarry (the "South Poultney quarry") and other quarries in Middle Granville, New York. At the South Poultney quarry, Roberts also operated a mill which processed and finished the slate removed from his quarries. The quarries and mill produced slate tile and flagstone.

During the entire relevant period, Roberts' South Poultney quarry was subject to the provisions of the Federal Mine Safety and Health Act of 1977, 30 U.S.C.A. § 801 et seq. (West Supp.1981), or its predecessor, the Federal Metal and Nonmetalic Safety Act. This brought the quarry within the regulatory jurisdiction of the Mine Safety and Health Administration (MSHA), or its predecessor, the Mining Enforcement and Safety Administration.

On May 30 and June 1, 1978, federal mine inspector John Rouba conducted an inspection of Roberts' South Poultney quarry and mill. Rouba spent May 30th inspecting the mill operation. On June 1st he inspected the quarry.

The South Poultney quarry was an open-pit quarry which measured 400 feet long from north to south and 150 feet wide from east to west. The eastern side of the quarry, referred to as the "east butt," consisted of a vertical rock wall approximately 125 feet high. The western side, referred to as the "west slant," consisted of a 30–40 foot wall which sloped downward toward the bottom of the quarry pit at a 60–70 degree angle. Apparently, the merchantable slate was removed from the west slant side of the quarry.

During his June 1st inspection of the quarry, Rouba noticed an "overburden" on the west slant. An overburden is a formation of rock, clay, and surface debris that hangs over the wall of the quarry. At the time of Rouba's inspection, quarrying underneath the surface of the ground proceeded in a westerly direction. The quarry operation left undisturbed a "collar" of slate at the top of the west wall. Over the collar was clay soil. The collar would not collapse unless it became detached from the main body of slate stone that supported the collar. As the quarry operation advanced to the west the overburden became more dangerous and eventually would fracture from the main body of stone and collapse with the clay soil above it and slide into the pit. The overhang, created by the collar and the clay above it, constituted a highly dangerous condition that threatened the safety of men working below the collar in the quarry pit. When Rouba inspected the quarry he regarded the presence of the overhang of slate and clay to be a violation of federal mine safety regulations, which require that

> Loose, unconsolidated material shall be stripped for a safe distance, but in no case less than 10 feet, from the top of pit or quarry walls, and the loose, unconsolidated material shall be sloped to the angle of repose.

30 C.F.R. § 56.3–2 (1981). Rouba apparently first observed this overburden while he was in the east side of the quarry pit.

Upon observing the overburden, Rouba went to the top of the east butt of the quarry, where he met with Roberts and informed him of the safety violation. The content of the ensuing conversation between Roberts and Rouba was sharply disputed at trial. Roberts claims that Rouba verbally ordered Roberts to remove the overburden by blasting it away with explosive charges. Roberts testified that he first

---

1. On August 6, 1980, the court granted the Government's request, pursuant to Federal Rule of Civil Procedure 42(b), for a separate trial on the issue of liability.

disagreed with Rouba about the existence of the overburden. Then Roberts stated he asked Rouba if he could use heavy equipment, such as bucketloaders or scrapers, to remove the condition, explaining to Rouba that such methods would take three to four weeks to complete. According to Roberts, Rouba said he could use a dragline method, but Roberts replied that this method would not work. Roberts also stated that Rouba knelt down and sketched directions for blasting on a piece of loose slate (Plaintiff's Exhibit 7).[2] Roberts testified that Rouba informed him that the quarry would be closed if the overburden was not removed. Roberts further testified that he expressed concern to Rouba that a blast would "bring . . . the whole meadow [into] the quarry pit." On redirect examination Roberts testified that Rouba also suggested the use of a backhoe to remove the overburden, but Roberts replied that this would not work either, because the equipment would sink into the clay behind the quarry wall.

Rouba confirmed that he suggested the use of heavy equipment to remove the overburden, but Roberts said the equipment would sink. According to Rouba, Roberts suggested the use of explosives as a method of removing the overburden. Rouba maintained that he issued no orders to Roberts; he merely informed Roberts that he would close the quarry in the event, on reinspection, he found men working underneath the overburden. Rouba did not recall ever making any sketches on pieces of slate during this conversation. Rouba testified that he issued no written citation to Roberts for the alleged safety violation.

In summary, there was no conflict in the evidence that the slate collar and the clay soil it held constituted a danger to the workers in the pit. All were agreed that the peril had to be removed in the interest of safety. The discussion between Roberts and the mine inspector Rouba centered on how the removal could best be accomplished.

From these conflicting accounts of the conversation, the court finds that Rouba observed an overburden which he believed constituted a safety violation. Rouba informed Roberts that his quarry would be ordered closed until the overburden was removed if he found employees working in the pit. The two men discussed the alternative methods of removing the overburden, but Rouba did not expressly order Roberts to use explosives. Indeed, Rouba suggested at least two other methods for removing the overburden, which Roberts concluded would not work. In any event, the decision as to how the overburden would be removed was left to Roberts and his chief quarryman, Leonard Winchell.

In May and June, 1978, Winchell was employed by Roberts as a pit foreman. On June 1st, after their conversation at the South Poultney quarry, Roberts and Rouba traveled to another of Roberts' quarries, the "Penrhyn Hill quarry," where Winchell was working. At that location, Roberts, Rouba and Winchell discussed how the removal of the overburden would be accomplished.

Winchell testified that ordinarily use of a backhoe to remove the clay overburden was the best method; "[B]ut in this case it (the clay) was wet and there'd be no way you could move it." Winchell testified that under the circumstances that existed at the time of the inspection, he assumed drilling and blasting was the best method for removing the overburden. Rouba did not mention explosives to Winchell. Neither Rouba nor Roberts directed Winchell how the removal should be accomplished. Rouba did state to Winchell "Bring down the overburden. It's unsafe." The inspector went on to admonish Roberts and Winchell by saying "If I catch you guys in there with the overburden still hanging I'll close the quarry down." Rouba indicated to Roberts and Winchell that he would check on the situation the following Monday. In the

---

**2.** The markings on the slate (Plaintiff's Exhibit 7) are for the most part illegible. No evidence was presented concerning what the scratch marks purported to show. The slate was never shown to Leonard Winchell, the plaintiff's quarryman who conducted the blasting operation.

course of this conference no reference was made to the slate (Plaintiff's Exhibit 7), which, according to the plaintiff, Rouba used to diagram instructions for removal of the overhang.

On June 6 and 7, 1978, several days after Rouba's inspection of the quarry, Winchell and Charles Burch, another Roberts Slate Company employee, conducted the drilling and blasting operation. Rouba was not present in the area during these activities. Although Winchell acted under the nominal supervision of Roberts, Winchell alone made all of the decisions about the operation. Winchell was experienced in this procedure and had used the drill and blast method on this same quarry wall on several previous occasions.

The drill and blast method entails drilling a series of holes in the area to be blasted, filling the holes with explosive material, covering and "tamping" the holes, and detonating the charges. Several critical decisions affect the blast: the placement, depth, and angle of the holes; the type and amount of explosive material placed in the holes; and the type and quantity of tamping. According to Winchell, all of these decisions were entirely left up to him.

Rainy weather prevented Winchell from completing preparations for the blast on June 6th. On June 7th he finally prepared the explosive charge. Between 3:00 and 3:30 p. m. on June 7th, after removing everything in the pit away from the west slant, the explosive charges were electrically detonated from a location approximately 500 feet away from the quarry. The explosion initially blew a relatively small amount of rock and debris into the quarry pit. Approximately 20 minutes after the blast, Winchell and Burch reentered the quarry pit with equipment to remove the rock and debris. While Winchell attempted to start a power shovel, he heard a loud crack and observed clay and stone falling into the quarry pit from the west side. Winchell and Burch fled from the pit. Almost immediately thereafter the west slant of the quarry collapsed and the pit was inundated with clay, rock and water. The collapse of the west wall completely destroyed the quarry. Fortunately, both Winchell and Burch escaped unharmed.

On the days following the blast, the Federal Mine Safety Administration began an investigation of the incident. The parties dispute the propriety of several aspects of this investigation, and there was considerable testimony during the trial relating to this subject. The investigation was beset by on-the-site news coverage. The court finds, however, that the post-accident conduct of both the quarry operator and the federal investigating party is irrelevant to the disposition of this case. The question for decision is Rouba's conduct during the June 1st inspection and his participation, if any, in the blasting operation.

In sum, the court finds that Rouba orally directed Roberts to remove the overburden. He warned that if he caught men working in the quarry under the overhang he would write an order to close the South Poultney quarry. Rouba did not order nor advise Roberts to use the drill and blast method in preference to other methods. Nor did Rouba in any way direct or participate in the actual drilling and blasting operation.

## CONCLUSIONS OF LAW

In a memorandum of decision dated May 6, 1978, this court denied the Government's motion for summary judgment. The court decided that the misrepresentation exception to the FTCA, 28 U.S.C. § 2680(h) (1976), precluded Roberts from recovering damages caused by his reliance on any representations made by Rouba. *Roberts v. United States*, No. 79–49 (D.Vt. May 6, 1980), slip op. at 2–3. Rouba's statements to Roberts that an overburden existed and Rouba's order to remove it were held to be not actionable under the FTCA.

In denying summary judgment, however, the court noted that Roberts' complaint alleged that Rouba "undertook to supervise and direct the detonation of explosives on plaintiff's premises and that he performed his undertaking negligently." *Id.*, slip op. at 3. The court held that these allegations stated a cause of action under section 323 of

the Restatement (Second) of Torts, which renders a person who performs services for another liable for harm resulting from his failure to exercise reasonable care in performing those services. *Id.*, slip op. at 3–4.

■ At the conclusion of the plaintiff's evidence, the United States moved for dismissal of the action under Rule 41(b), Fed. R.Civ.P. In support of the motion, the Government urged the court to dismiss the case because Inspector Rouba's actions fall within the "discretionary function" exception to the FTCA, 28 U.S.C. § 2680(c) (1976). This exception renders the FTCA inapplicable in claims

> based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* This contention presents the first question for decision since, as in the case of the misrepresentation exception, the court is without subject-matter jurisdiction if this exception covers Rouba's conduct. *See Stanley v. Central Intelligence Agency*, 639 F.2d 1146, 1147, 1157 (5th Cir. 1981); *First Nat'l Bank v. United States*, 552 F.2d 370, 374 (10th Cir.), *cert. denied*, 434 U.S. 835, 98 S.Ct. 123, 54 L.Ed.2d 96 (1977); *Sanchez Tapia v. United States*, 338 F.2d 416, 416–17 (2d Cir. 1964), *cert. denied*, 380 U.S. 957, 85 S.Ct. 1096, 13 L.Ed.2d 974 (1965).[3]

■ The Government contends that Inspector Rouba, in ordering Roberts to remove the overburden, acted within his discretion as a mine safety inspector. Roberts, in opposing the motion, contended that Rouba ordered him to use the drill and blast method, and that an order encompassing the method of curing a safety violation is not within the permissible limits of a safety inspector's discretion.

In conducting the inspection of the South Poultney slate quarry and mill on May 30 through June 1, 1978, Inspector Rouba undertook to act under the authority conferred upon the Secretary of Labor under the provisions of the Federal Mine Safety and Health Act of 1977, as amended. Pub.L. 95–164, § 201 (30 U.S.C.A. § 814(a) & (b) (West Supp.1981)). This is made clear from the fact that Rouba gave the plaintiff a copy of the Act.

In the course of the inspection Rouba found a condition which he judged to be a continuing danger that constituted a violation of 30 C.F.R. § 56.3–2, *supra.*

The relevant provisions of 30 U.S.C.A. § 814(a) state:

> If, upon inspection or investigation, the Secretary or his authorized representative believes that an operator of a coal or other mine subject to this chapter has violated this chapter, or any mandatory health or safety standard, rule, order, or regulation promulgated pursuant to this chapter, he shall, with reasonable promptness, issue a citation to the operator. Each citation shall be in writing and shall describe with particularity the nature of the violation, including a reference to the provision of this chapter, standard, rule, regulation, or order alleged to have been violated. In addition, the citation shall fix a reasonable time for the abatement of the violation.

In warning the plaintiff and his foreman Winchell that he would follow up the initial inspection to determine whether the overburden had been removed, and, if it was not removed, whether the quarry could operate under the danger he observed, Rouba followed the statutory design of § 814(b). It is there provided:

> If, upon any follow-up inspection of a coal or other mine, an authorized representative of the Secretary finds (1) that a violation described in a citation issued pursuant to subsection (a) of this section has not been totally abated within the period of time as originally fixed therein or as subsequently extended, and (2) that

---

**3.** The FTCA represents a limited waiver of sovereign immunity by the United States. Absent such a waiver, this court has no jurisdiction to adjudicate suits against the United States. *United States v. Mitchell*, 445 U.S. 535, 538,

100 S.Ct. 1349, 1352, 63 L.Ed.2d 607 (1980). Accordingly, if the defendant's conduct falls within a statutory exclusion to the FTCA, the court is without subject matter jurisdiction.

the period of time for the abatement should not be further extended, he shall determine the extent of the area affected by the violation and shall promptly issue an order requiring the operator of such mine or his agent to immediately cause all persons, except those persons referred to in subsection (c) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.

From the evidence presented at the bench trial, it appears that no citation *in writing* was issued as required by subsection (a); no formal order was issued as prescribed by subsection (b). Had the statutory directives in this regard been followed, it may well be that the discretionary exception provided in 28 U.S.C. § 2680(c) would be availing to the defendant. However, the discretionary exception under this provision of the Tort Claims Act applies only if the federal employee acts within the scope of his authority.

[A] discretionary function can only be one within the scope of authority of an agency or an official, as delegated by statute, regulation, or jurisdictional grant . . . .

*Birnbaum v. United States,* 588 F.2d 319, 329 (2d Cir. 1978). *See also Dalehite v. United States,* 346 U.S. 15, 36, 73 S.Ct. 956, 968, 97 L.Ed. 1427 (1953) (acts of subordinates in carrying out the operations of government in accordance with official direction cannot be actionable).

In undertaking to issue an oral citation for a violation of the safety regulation, Inspector Rouba acted beyond the authority granted to the Secretary or his delegate under the provisions of 30 U.S.C.A. § 814(a) and (b). In so doing he exceeded the discretion conferred under the Act. The court holds that this departure from the statutory directive precludes the protection of the discretionary function provided in 28 U.S.C. § 2680(c).

The only remaining question is whether the defendant can be held liable for negligent conduct on the part of Inspector Rouba in the removal of the overburden by the use of explosives at the South Poultney quarry on June 7, 1978.

The sole theory of liability advanced by the plaintiff is that expressed in section 323, Restatement Second of Torts.

One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking.

■ Under this concept of tort liability, if responsible officers of the United States undertake to perform services and engender reliance on the part of the recipient of such service, the Government officials are obligated to use due care in their undertaking. *Indian Towing Co. v. United States,* 350 U.S. 61, 69, 76 S.Ct. 122, 126, 100 L.Ed. 48 (1955).

■ On the facts presented by the evidence in the instant case, there is a distinct and patent shortage of proof in the plaintiff's failure to establish that Inspector Rouba undertook to render advice or assistance to the plaintiff in alleviating the dangerous condition. In the course of his inspection of the South Poultney quarry, Rouba observed the danger of the overburden of stone and clay that protruded over the quarry pit. He expressed the immediate need for its removal and referred to the consequences of closure if his warning was not heeded. However, the means and method for "taking in" the danger was left entirely to the decision of the plaintiff and his quarryman Winchell. Winchell and Burch selected and conducted the drillings; they applied and detonated the powder. Rouba was not present at the site during the operation. The evidence fails to establish that Rouba gave any specific direction concerning how the operation was to be performed.

In sum, there is no affirmative showing in the proof presented that Rouba, as an

officer of the United States, undertook to render services to Roberts which imposed an obligation or duty of reasonable care. Since Rouba was not a participant in selection of the method for correcting the dangerous condition and did not engage in the blasting operation, the defendant is not liable to the plaintiff as alleged in the complaint. The clerk is directed to enter judgment for the defendant.

It is so ORDERED.