653 F.2d 437
 Galen J. BAIRD, Plaintiff-Appellant,
v.
UNITED STATES of America, Defendant-Appellee,
v.
CAPITOL AIR SERVICE, INC. and Vanguard Insurance Company,
Intervenors-Appellants.
and
CAPITOL AIR SERVICE, INC. and Vanguard Insurance Company,
Plaintiffs-Appellants,
v.
UNITED STATES of America, Defendant-Appellee.
 Nos. 79-1197, 79-1441.
 United States Court of Appeals,
Tenth Circuit.
 Argued Nov. 20, 1980.
Decided June 29, 1981.
 
 Alan L. Rupe of Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan. (Meryl D. Wilson of Stites, Hill & Wilson, Manhattan, Kan., and Darrell D. Kellogg of Kahrs, Nelson, Fanning, Hite & Kellogg, Wichita, Kan., with him on the brief), for plaintiffs-appellants.
 James P. Buchele, U. S. Atty., Topeka, Kan., for defendant-appellee.
 Before BARRETT, DOYLE, and SEYMOUR, Circuit Judges.
 SEYMOUR, Circuit Judge.
 
 
 1
 This is a consolidated appeal after dismissal of a Federal Tort Claims suit under 28 U.S.C. §§ 1346(b), 2671-2680,[1] against the United States for damages that resulted when a small aircraft crashed off the runway at the Paul Windle Airport in Kansas. The claimants are pilot Galen Baird, his employer Capitol Air Service, Inc., and its insurer Vanguard Insurance Co. (collectively "plaintiffs"). They claim that the Government published a misleading aeronautical chart that caused Baird to overestimate the length of a lighted runway on the evening of the crash. The district court dismissed for lack of subject matter jurisdiction after concluding that the chart's issuance fell within the discretionary-function exception of 28 U.S.C. § 2680(a)[2], and that sovereign immunity therefore barred the claim. We affirm.
 
 
 2
 The parties do not dispute the material facts. At approximately 9:30 p. m. on July 27, 1976, Baird and three passengers flew in Kansas from Ulysses to Greenburg. The group traveled in a Piper Seneca, a small aircraft. In making his landing approach at Greenburg's Paul Windle Airport, Baird used the Wichita Sectional Aeronautical Chart (16th ed., June 17, 1976). The symbols
 
 PAUL WINDLE
 2230-L-28
 
 3
 appeared on the chart. According to the chart's legend, "PAUL WINDLE" symbolized the name of the airport. The "2230" indicated "Elevation in feet (above sea-level)." The "28" described the "Length of longest runway in hundreds of feet." Finally, the symbol "L" was to be interpreted according to the following legend:
 
 
 4
 "L Lighting in operation Sunset to Sunrise
 
 
 5
 *L Lighting available Sunset to Sunrise only on request (by radio call, letter, phone, telegram).
 
 
 6
 (L) Lighting in operation part of the night and on request, or not operating thereafter. When facility or information is lacking, the respective character is replaced by a dash."
 
 
 7
 Rec., supp. vol. II.
 
 
 8
 From the sectional chart, then, Baird could infer that runway lights would be on at Paul Windle Airport from sunset to sunrise. And in fact, they were. But Baird inferred, in addition, that the runway lights he saw from the air marked off Paul Windle's longest runway whose length in hundreds of feet was reflected in the "28" symbol. Unfortunately, the lighted runway was not Paul Windle's longest. It was a shorter one only 2,580 feet long. Moreover, that runway was lighted for only 2,176 of its 2,580 feet. The aircraft overran the runway and crashed. Two passengers were killed, the third and Baird severely injured.
 
 
 9
 The Wichita sectional chart expressly states that it was "published in accordance with Inter-Agency Air Cartographic Committee specifications." Rec., supp. vol. II. This Committee, commonly known as the IACC, was created by agreement of the Department of Defense, the Federal Aviation Administration, and the Commerce Department. These three federal agencies intended the IACC to "develop the final detailed and authoritative specifications for the actual flight information materials (both textual and chart forms) which will constitute the official operative materials produced or used by Government agencies," Rec., vol. IV, at 1, subject to the agencies' review and approval. Rec., vol. IV, at 5. Once approved, the specifications would become binding. See id.[3]
 
 
 10
 In exercise of its authority, the IACC promulgated specifications, which pertinently provide:
 
 
 11
 "(5) The airport name shall be supported by the following coded data, positioned immediately above, following or below the airport name as indicated. A dash shall be substituted for the elevation, lighting, or runway length when not shown.
 
 
 12
 "...
 
 
 13
 "(e) Lighting symbolization shall indicate the availability of runway lighting to facilitate night landings, and shall be shown below the airport name following the elevation. Runway lighting is defined as a system of lights which defines the useable runway surface and includes lateral lights, referred to as runway lights which mark the sides of the runway, and threshold lights which mark the ends. Lighting in operation sunset to sunrise shall be indicated by the letter 'L.' Lighting available sunset to sunrise only on request (by radio call, letter, phone, telegram) shall be indicated by an asterisk (*) preceding the letter 'L.' Lighting on and operating part of the night and on request, or not operating thereafter, shall have the letter 'L' in parenthesis, e. g. (L). The absence of a night landing capability shall be indicated by a short dash in lieu of the letter 'L.'
 
 
 14
 "(f) The runway length shall be positioned below the airport name following lighting. Runway length shall be the actual length of the longest active runway (pavement, end to end), including displaced thresholds, but excluding those areas designated as overruns. Runway length shall be shown to the nearest 100 feet using 70 as the division point; e. g., 59 shall be used to indicate a runway of 5,870."
 
 
 15
 Rec., vol. V, at 94-95.
 
 
 16
 The "PAUL WINDLE/2230-L-28" symbols on the Wichita sectional chart are in literal compliance with the quoted specifications. Lights were on sunset to sunrise and the longest runway was 2,800 feet. Nevertheless, plaintiffs contend that the Government should be liable for the chart's failure to tell pilot Baird that the longest runway to which the "28" symbol referred was not the runway to which the lighting symbol "L" referred, and that the shorter runway was lit for only 2,176 of its 2,580 feet. They argue that the discretionary-function exception of 28 U.S.C. § 2680(a) does not apply to the Government's "accumulation, standardization, publication and distribution of inaccurate and misleading symbolic information" in the Wichita sectional chart. Appellants' Brief at 1-2. We are compelled to disagree.
 
 
 17
 Section 2680(a), like every other exception in 28 U.S.C. § 2680, limits the Government's waiver of sovereign immunity. It therefore poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction. See First National Bank v. United States, 552 F.2d 370, 374 (10th Cir.), cert. denied, 434 U.S. 835, 98 S.Ct. 122, 54 L.Ed.2d 96 (1977); Smith v. United States, 546 F.2d 872, 875-76 (10th Cir. 1976); cf. United States v. Kubrick, 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979) (time limitation on sovereign's consent to suit; 28 U.S.C. § 2401(b)); Knapp v. United States, 636 F.2d 279 (10th Cir. 1980) (same; 28 U.S.C. § 2409a(f)). Thus, to test the district court's jurisdictional dismissal, we must determine whether plaintiffs have challenged a "discretionary function or duty." 28 U.S.C. § 2680(a). But we need not wallow too long in the quagmire of what makes a governmental function discretionary or nondiscretionary, see generally Allnutt v. United States, 498 F.Supp. 832, 835-36 (W.D.Mo.1980); Blessing v. United States, 447 F.Supp. 1160, 1167-85 (E.D.Pa.1978), for we believe plaintiffs' claim falls squarely within the bar of section 2680(a).
 
 
 18
 Plaintiffs state their claim in terms of the Government's publishing misleading information on the Wichita sectional chart. In essence, they argue the Government could have avoided ambiguity altogether by providing information on the chart to correlate the longest-runway symbol to the available-lighting symbol. But whatever ambiguity inheres in the chart's symbols is traceable to the very terms of the specifications as developed by the IACC. See p. 438 supra. If there is a flaw in the chart, it is a flaw in the design of the IACC specifications themselves, for the chart's symbols are the specifications incarnate. Plaintiffs do not controvert the Government's contention that it has never undertaken
 
 
 19
 "to indicate on its sectional aeronautical charts which runway at every airport has lights, how much of each runway is lit or the length of each runway. It would be virtually impossible to provide all data available for a particular airport with any clarity without causing a clutter situation on the sectional chart."
 
 
 20
 Rec., vol. I, at 27. For all that plaintiffs have asserted, they seek redress for the IACC's decision to not require more detailed information on aeronautical charts such as the Wichita sectional chart. Their suit amounts to a challenge of the IACC's decision on how much possible ambiguity it was willing to tolerate from lack of detail on sectional aeronautical charts, in favor of other policy goals such as chart clarity. The IACC could well have decided that its sectional charts would provide pilots certain minimum information, leaving to the pilot the responsibility of further inquiry for details from other sources available to him. In our view, this is precisely the kind of discretionary judgment that Congress in section 2680(a) meant to shield from suit: "determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." Dalehite v. United States, 346 U.S. 15, 35-36, 73 S.Ct. 956, 967-968, 97 L.Ed. 1427 (1953). The principle upon which section 2680(a) rests appeared early and succinctly in our jurisprudence, when Chief Justice John Marshall said:
 
 
 21
 "It is scarcely necessary for the court to disclaim all pretensions to such jurisdiction (to review the executive's discretionary functions). An extravagance, so absurd and excessive, could not have been entertained for a moment. The province of the court is ... not to inquire how the executive, or executive officers, perform duties in which they have a discretion."
 
 
 22
 Marbury v. Madison, 5 U.S. (1 Cranch) 137, 170, 2 L.Ed. 60 (1803).
 
 
 23
 Unlike cases relied upon by plaintiffs to support their claim, we do not have here a situation where negligence has attended the mechanical preparation, as distinguished from the substance of the design, of an aeronautical chart. See, e. g., Reminga v. United States, 631 F.2d 449, 451-52 (6th Cir. 1980) (TV tower's ground location depicted inaccurately on chart); Allnutt v. United States, 498 F.Supp. 832, 835 (W.D.Mo.1980) (failure of chart to depict existing power transmission line). Neither is this a situation where use of the wrong lighting symbol caused the chart to expressly contradict conditions on the ground. See, e. g., Murray v. United States, 327 F.Supp. 835, 839, 841 (D.Utah 1971) (chart symbols and other information indicated lighting available throughout night or in any event upon aircraft's circling field; pilot unable to get lights on even after circling field), aff'd, 463 F.2d 208 (10th Cir. 1972); Sullivan v. United States, 299 F.Supp. 621, 625 (N.D.Ala.1968) (use of "L" symbol where "*L" called for lead pilot to expect lights on from sunset to sunrise, but when arrived during night flight, found lights off), aff'd, 411 F.2d 794 (5th Cir. 1969). Finally, we do not have a situation where negligence is confined essentially to the operation of a government facility or enterprise. See, e. g., Indian Towing Co. v. United States, 350 U.S. 61, 62, 76 S.Ct. 122, 123, 100 L.Ed. 48 (1955) (negligent repair and maintenance of government lighthouse); Smith v. United States, 546 F.2d 872, 874-75 (10th Cir. 1976) (negligent failure to post signs to warn of superheated thermal pools in Yellowstone National Park); Yates v. United States, 497 F.2d 878, 882 (10th Cir. 1974) (FAA air controller's negligent failure, while directing air traffic, to provide adequate separation between aircraft); United Air Lines, Inc. v. Wiener, 335 F.2d 379, 392-98 (9th Cir.) (negligent operation and use of Air Force pilot training procedures that disregarded Air Force regulations), cert. dismissed, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549 (1964). The negligence in all these cases did not relate to discretionary or judgmental activities by the Government, so section 2680(a) did not apply.
 
 
 24
 From the last four cases cited above, the dissent concludes that the discretionary-function exception does not cover the IACC's decision in this case on how detailed to make the runway lighting information in charts such as the Wichita sectional. In the dissent's view, the lack of detail here amounts to an actionable breach of duty by the Government to warn of dangers. We do not believe, however, that the breach of duty in the course of the operational activities found actionable in those cases can be properly likened to the IACC's discretionary design choices challenged here. It is important to note that plaintiff's challenge goes only to the Wichita chart. And no defect is claimed in that chart apart from the IACC specifications to which it conforms. In actuality, the challenge applies to the design of all sectional charts. Viewed in its essence, plaintiffs' claim is that the Wichita chart and all others like it should provide more detailed and hence more accurate information.
 
 
 25
 Simply put, plaintiffs challenge the Wichita sectional chart because it was too sketchy. This challenge thus goes to the heart of the IACC's deliberative and judgmental activities in designing and approving the extent of detail to be included in aeronautical sectional charts versus the extent of detail left to be gleaned from other sources that the prudent pilot can be expected to consult. Such design and approval activities or choices by the Government fall within the discretionary-function exception and are not actionable under the Federal Tort Claims Act. See, e. g., Reminga v. United States, 631 F.2d 449, 454-56 (6th Cir. 1980) (activity in designing FAA regulations that do not require lighting or other warning markers on tower guy wires); Wright v. United States, 568 F.2d 153, 154 (10th Cir. 1977) (activity of Interior Department in designing approach roads to bridge), cert. denied, 439 U.S. 824, 99 S.Ct. 94, 58 L.Ed.2d 117 (1978); First National Bank v. United States, 552 F.2d 370, 376 (10th Cir. 1977) (activity of Agriculture Department in devising warning labels for pesticides and investigating dangers connected with prior use of such pesticides); Miller v. United States, 522 F.2d 386, 387 (6th Cir. 1975) (failure to adopt more strict air safety regulations); Spillway Marina, Inc. v. United States, 445 F.2d 876, 878 (10th Cir. 1971) (policy decision to lower reservoir's water level created alleged need to give warnings; held Government's omission within discretionary-function exception and not negligence at operational level). See also Payton v. United States, 636 F.2d 132, 146-47 (5th Cir. 1981); Green v. United States, 629 F.2d 581, 585-86 (9th Cir. 1980). Contrary to the dissent, we believe that the IACC's activities here are more analogous to those in cases like Reminga, Wright, First National, Miller, and Spillway, than to the operational activities in Indian Towing, Smith, Yates, or United Air Lines. We must therefore affirm the district court's dismissal of plaintiffs' claim.[4]
 
 
 26
 Affirmed.
 
 
 27
 WILLIAM E. DOYLE, Circuit Judge, dissenting.
 
 I respectfully dissent:
 
 28
 Involved here are two cases arising out of a single incident, which cases were brought under the Federal Tort Claims Act in the United States District Court for the District of Kansas. The one action is by a pilot, one Baird, employed by Capitol Air Services, Inc. In the other action the intervenor, the workmen's compensation insuror, has asserted a subrogation claim seeking damages from the United States for the alleged negligent Accumulation, Standardization, Publication and Distribution of Information in the Wichita aeronautical sectional chart, specifically the Paul Windle Airport in Greensburg, Kansas. The trial court dismissed the action holding that the government's acts fell within the protected exception of the Tort Claims Act inasmuch as it was a discretionary function that was being carried out; that therefore the United States District Court lacked subject matter jurisdiction over the cause.
 
 
 29
 This was a small aircraft which was being piloted by Baird, who was very seriously injured in the accident. Two of his three passengers were killed.
 
 
 30
 The United States government's Inter-Agency Cartographic Committee, under the direction of the Federal Aviation Agency, the Department of Defense, and the Department of Commerce, prepared charts and updated the same providing flight information materials. The charge here is that the United States through the IACC published incorrect and misleading information regarding the Paul Windle Airport, and at the same time failed to warn appellant of this; that this incorrect information was the proximate cause of the accident involved in this case and of the appellant's damages. Specifically, appellant maintains that the chart failed to inform him that the longest runway at that airport was not the lighted runway, and the shortest runway was not lighted in its entirety. Nevertheless, the trial court dismissed the case without any trial and so ruled on the conclusion that there was a lack of subject matter jurisdiction (which has been mentioned). So, basically the question here is whether the trial court erred in finding that the defendant's failure to warn the plaintiff of the true condition constituted a decision protected by the discretionary function doctrine.
 
 
 31
 The asserted defense arises under 28 U.S.C. § 2680 which sets a number of exceptions to the Federal Tort Claims Act. It provides:
 
 
 32
 "the provisions of this chapter * * * do not apply to
 
 
 33
 (a) Any claim * * * based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the government, whether or not the discretion involved be abused."
 
 
 34
 The trial court's holding is predicated upon the Supreme Court's decision in Dalehite v. United States, 346 U.S. 15, 35-6, 73 S.Ct. 956, 967-968, 97 L.Ed. 1427 (1953). That decision did construe the discretionary function provision and held that it included "determinations made by executives or administrators establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion." The trial court held that the IACC specifications do not require that the government should provide information regarding lighting on runways other than the times of operation and general availability, and therefore that jurisdiction must be predicated on the formulation of aeronautical specifications falling outside the "discretionary function" exception. The court also held that the preparation and promulgation of acceptable flight information by the IACC was an activity calling for the exercise of policy judgment and decision, and thus it fell within the definition of a discretionary function under Dalehite, supra.
 
 
 35
 I respectfully disagree with the majority decision.
 
 
 36
 The contention of appellant is that the United States had a duty to accurately represent those features of the chart which it undertook to depict. Appellant cites several cases for this proposition. However, the trial court found these cases inapplicable in that the information published (in those cases) failed to comply with the government's specifications, or the court found the government liable because a government employee at the airport was negligent, (or the government's instructions to the employee were negligent), or the court found the government liable for failure to exercise any discretion at all rather than being liable for an action taken pursuant to the exercise of that discretion.
 
 
 37
 The trial court's further holding was that the plaintiff could not establish liability of the United States on a strict liability theory for its conduct in relegating an ultrahazardous activity because the FTCA does not permit or authorize an imposition of strict liability of any sort upon the government. Laird v. Nelms, 406 U.S. 797, 92 S.Ct. 1899, 32 L.Ed.2d 499 (1972) and Dalehite, supra. That was essentially the holding in the Dalehite case. The Supreme Court ruled that none of the employees of the government were negligent and that there was no basis in the Federal Tort Claims Act for holding the government liable on an ultrahazardous activity ground. I have no disagreement with this.
 
 
 38
 The argument of appellant is that the government's decision to not warn as to the existence of known dangers or hazardous conditions, when it would have been very easy to have done so, cannot be considered the exercise of a discretionary function. Surely the United States is not going to exercise discretion by deciding to create a hazard. The appellant relies on the decision in this court in Smith v. United States, 546 F.2d 872 (10th Cir. 1976). The trial court sought to distinguish Smith on its facts. It stated that in Smith the court found no connection between the discretionary decision to leave part of Yellowstone Park undeveloped and the decision not to warn plaintiff of superheated pools in the undeveloped area. In the instant case the court said the IACC had discretion, so it is maintained by appellee, to decide what should or should not appear on the aeronautical charts even though it was misleading to the point of creating a risk of harm.
 
 
 39
 Appellant maintains that in the instant case, as in Smith, the duty to warn of known hazards existed independent of the discretionary decision. In other words, the appellant contends that the discretion was exercised with respect to the decision to prepare the charts. This is quite another thing from the presence of the misleading information on the charts once they are prepared. Thus the exception for discretionary decisions does not create immunity or exemption with respect to acts of negligence which were plain and which could have been easily avoided.
 
 
 40
 Perhaps the threshold issue in the case is whether the particular act of negligence here involved was a part of the policy decision-making or was more related to the operational activity. My reaction is that the activity here in the present case is closer to the operational level than it is to the planning function. I say that since it involved a negligent act it was not a permissible policy decision. Also it is more a part of operations in that the charts furnish information to the traveler by air to guide him in his landing in the same manner that an air controller would do if one were present. In this case there was no air controller so the pilot was at the mercy of the chart.
 
 
 41
 Our decision in Yates v. United States, 497 F.2d 878, involved the negligence of an air controller who ordered the pilot of a small airplane attempting a landing, to follow in the wake of a large TWA liner, a 707. The crash was caused by an encounter with wake turbulence at an insufficient altitude to recover before striking the ground. The court held that the United States was liable for the negligence of its airport personnel. We concluded that the negligence of the FAA controllers consisted of failing to provide adequate separation between the decedent's aircraft and the preceding TWA 707 transport aircraft.
 
 
 42
 The analogy between the air controller and the use of the chart as a guide to landing is not, of course, complete. If one is in touch with the tower, undoubtedly he is in a better position to know what the situation is. But that was not possible in the case at bar. The only information which was provided was the elevation of the airport in Greensburg, Kansas, the length of the longest runway in hundreds of feet and it then stated that lighting and operation sunset to sunrise only on request by radio call letter phone telegram. The data does not include how many runways there are which are lighted and the length of the lighted runway. It only tells the pilot the elevation, the lighting and the longest runway's length. Therefore, Baird had the right to believe that there was only one runway which was 2800 feet in length and that it was lighted because that one was lighted when he started to land. Consequently, the chart, which was intended to guide an airplane into the airport, was highly misleading. It gave half of the information and the half which was not disclosed could have prevented the accident. Thus it was this neglect which was the proximate cause of running off the runway and crashing.
 
 
 43
 The Supreme Court decision in Indian Towing v. United States, 350 U.S. 61, 76 S.Ct. 122, 100 L.Ed. 48 (1955) bears some analogy to this present case in that there the question was one of failure to provide adequate lighting in the operation of a lighthouse. The allegation was that the tug Navajo, owned by Indian Towing Co., was towing a barge chartered by the petitioner, Upper Mississippi Towing Corp., which barge was loaded with cargo, and the tug went aground on Chandeleur Island. As a result sea water damaged the cargo. The action was against the government for failure to inspect the lighthouse so as to keep the light on, because it was the result of the lack of lighting that the ship went aground. In the opinion Justice Frankfurter said that the question was liability for negligence and what the court has characterized the "operational level" of governmental activity. It was contended that the Act had to read as excluding liability in the performance of activities which private persons do not perform. Thus, it was said, there would be no liability for negligent performance of uniquely governmental functions. Justice Frankfurter said:
 
 
 44
 the government reads the statute as if it imposed liability to the same extent as would be imposed on a private individual 'in the same circumstances'. But the statutory language is 'under like circumstances,' and it is hornbook tort law that one who undertakes to warn the public of danger and thereby induces reliance must perform his 'good Samaritan' task in a careful manner. (emphasis supplied)
 
 
 45
 In the case at bar the activity of the government in preparing the chart could be regarded as an undertaking such as is spoken of in Indian Towing.
 
 
 46
 The court rejected the government's contention as to the boundaries of liability and said that the effort on the part of the government was to gauge liability as if the government were a municipal corporation and not as if it were a private person, and "it would thus push the courts," Justice Frankfurter said, "into the 'non-governmental'-'governmental' quagmire that has long plagued the law of municipal corporations." After discussing the failure of the standard applicable to municipal corporations, the opinion concluded:
 
 
 47
 The Federal Tort Claims Act cuts the ground from under that doctrine; it is not self-defeating by covertly embedding the casuistries of municipal liability for torts.
 
 
 48
 In rejecting the " 'governmental'-'non-governmental' " distinction the opinion stated:
 
 
 49
 there is nothing in the Tort Claims Act which shows that Congress intended to draw distinctions so finespun and capricious as to be almost incapable of being in the mind for adequate formulation.
 
 
 50
 350 U.S. at 68, 76 S.Ct. at 126.
 
 
 51
 The rationale for the Supreme Court's conclusion was that although the Coast Guard did not need to undertake the lighthouse service, once it exercised its discretion to operate a light on the island and engendered reliance on the guidance afforded by the light, it was obligated to use due care in making certain that the light was kept in good working order; and, if the light did become extinguished, then the Coast Guard was further obligated to use due care to discover this fact and repair the light or give warning that it was not functioning. Its failure to perform this duty resulted in the injury to the parties involved.
 
 
 52
 The decision in Indian Towing gave only brief consideration to Dalehite. It merely said that "the governing factors in Dalehite sufficiently emerge from the opinion in that case."
 
 
 53
 It follows from the above that I see this case as one which arose not at some planning level, which is remote from the scene, but rather it emerged from continuing negligence in providing a chart which was incomplete but nevertheless persuaded people to depend upon it. It was not merely a sin of omission. Indeed, it contained misleading information and thus my view is that there is at least presumptive liability and there is jurisdiction. The facts do not rule it out on a jurisdictional basis. The case should be reversed and it should be tried.
 
 
 54
 I do not doubt that high level policy decisions, judgments and adjudications may well result in non-liability because this is in line with the exception that contemplates this kind of thing. But just because the preparation for the day of decision on the airfield occurs away from the field does not mean that the handiwork of those who have prepared the chart can be regarded as all part of the discretionary effort. There cannot be a discretionary effort which authorizes the commission of palpably negligent acts. The discretionary effort is to do some general task which is required because of or in spite of its policy ramifications. Such a policy decision would be a change in the course of the Missouri River, Coates v. United States, 181 F.2d 816 (8th Cir. 1950), measures to protect migratory fowl, Sickman v. United States, 184 F.2d 616 (7th Cir. 1950), cert. denied, 341 U.S. 939, 71 S.Ct. 999, 95 L.Ed. 1366, rehearing denied 342 U.S. 843, 72 S.Ct. 21, 96 L.Ed. 637, measures to conduct tests of nuclear explosions, Bartholomae Corp. v. United States, 135 F.Supp. 651 (S.D.Calif.1955), see also a decision not to operate a seized coal mine is an exercise in discretion, Old King Cole Co. v. United States, 88 F.Supp. 124 (S.D.Iowa 1949), see also Prosser on Torts, 4th Ed., pp. 972-974.
 
 
 55
 Prosser, supra, declares there have been as many cases which have held that such operational exercise of discretion are not contemplated by the Act, and this seems definitely indicated by the position of the Supreme Court in Indian Towing Co. v. United States, supra. There is a good discussion of "discretionary" by the Ninth Circuit in United Air Lines, Inc. v. Wiener, 335 F.2d 379, 393, cert. denied, 379 U.S. 951, 85 S.Ct. 452, 13 L.Ed.2d 549. The language referred to is as follows:Discretionary to undertake fire-fighting, lighthouse, rescue, or wrecked-ship marking services, but not discretionary to conduct such operations negligently, discretionary to admit a patient to an Army hospital, but not discretionary to treat the patient in a negligent manner; discretionary to establish a post office at a particular location, but not to negligently fail to install handrails; discretionary to establish control towers at airports and to undertake air traffic separation, but not to conduct the same negligently; discretionary to reactivate an airbase, but not to construct a drainage and disposal system thereon in a negligent fashion; and discretionary for CAA to conduct a survey in low flying, twin-engine airplane, but not for pilots thereof to fly negligently.
 
 
 56
 A significant factor in Dalehite is its mention that none of the employees of the United States were negligent and that the United States could not be held liable based upon ultrahazardous activity where no one of its employees was guilty of negligence and where it exercised discretion in undertaking the activity. That certainly does distinguish the present case from Dalehite.
 
 
 57
 In summary the majority opinion declares that if the designers had sought to stop short of giving full information (in the chart), there is no liability because of the decision being made at the mapmaking level; they were at liberty to require the pilot to ask questions if he considered it to be necessary. I respectfully ask how could he make an inquiry if he did not know that the important information had been omitted from the chart? Thus if he holds the belief that all the information available has been provided and there has been a misleading omission, certainly he has been the victim of actionable negligence. The fact that he is engaged in a very dangerous activity, that is land airplanes at night, does not affect the recommended outcome of the case. It emphasizes the need to have exact information at the scene where it is known that the pilot is going to rely on the chart.
 
 
 58
 The presence of this general principle involving the exercise of discretion surely does not cover the multitude of sins which it seeks to cover here. It does not grant immunity for the creation of an unnecessary hazard, one which could have been easily avoided.
 
 
 59
 These, then, are my reasons for respectful disagreement with the majority opinion. Obviously, I would remand the case for a full scale trial in which the court makes the inquiries that are suggested and then addresses the merits.
 
 
 
 [1]
 Section 2674 provides in pertinent part:
 "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances ...."
 28 U.S.C. § 2674. The jurisdictional counterpart in section 1346(b) says:
 "Subject to the provisions of chapter 171 of this title (28 U.S.C. §§ 2671-2680), the district courts, together with the United States District Court for the District of the Canal Zone and the District Court of the Virgin Islands, shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred."
 Id. § 1346(b).
 
 
 [2]
 Section 2680(a) provides in pertinent part:
 "The provisions of this chapter and section 1346(b) of this title shall not apply to
 (a) Any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused."
 28 U.S.C. § 2680(a).
 
 
 [3]
 More fully, the inter-agency agreement described the IACC's purpose and authority as follows:
 "PURPOSE
 The purpose of the Inter-Agency Air Cartographic Committee (IACC) is twofold:
 
 
 [1]
 First, to develop those final chart and textual material specifications which will provide acceptable flight information materials for operation in the airspace and for adequately controlling operations in that airspace. Since there may be individual differences in acceptable final specifications for civil and governmental airspace operations, there may be more than one set of final specifications arrived at by the IACC, although it will be a prime objective to reduce or eliminate such differences. In every case, it is mandatory that the minimum standards referred to earlier be an integral part of the final specifications
 
 
 [2]
 Second, to ensure that flight information materials necessary for the fulfillment of the operational requirements of users are produced at minimum cost and with no unnecessary duplication
 "....
 "SCOPE OF AUTHORITY
 The IACC is empowered to develop the authoritative final specifications for flight information materials. It is empowered to continuously review and update those final specifications on the basis of changing needs or roles of the governmental organizations concerned. It will be the intent of the IACC to foster the maximum desirable standardization of flight information materials, consonant with the operational requirements, of the user agencies. Whatever the final form of these textual and chart materials, they will constitute the authoritative information by means of which Governmental users operate in the airspace. Further, it will assist in the Government control of the operations in that airspace.
 "....
 "INTENT AND DURATION
 
 
 [1]
 The IACC is an authoritative decision-making body whose members can speak for, and commit, their agencies to actions resulting from the IACC's continuing reviews and evaluations. All decisions of the IACC will be subject to the review and approval of the agencies concerned. Subsequent to this review and approval, the decisions of the IACC will be binding on the agencies concerned."
 Rec., vol. IV, at 1-2, 5.
 
 
 [4]
 This dismissal does not foreclose all relief for plaintiffs. They are free to seek private relief through congressional action